## FREE BAPTISTS LEGAL SUCCESSORS OF FREE WILL BAPTISTS.

Circuit Court of Scioto County.

CHARLES O. GRAHAM ET AL, TRUSTEES, v. FREDERICK F. RANSA-
HOUS, GENERAL CONFERENCE OF FREE BAPTISTS
OF THE UNITED STATES, ET AL.

Decided, March 23, 1908.

*Religious Societies—Status of the General Conference of Free Baptists
—Claim of, to be the Successors of the Free Will Baptists Con-
firmed—No Change in Faith and Tenets, and No Schism—Litiga-
tion between Church Factions—Unreversed Judgment is Res Adju-
dicata as to, When—Not Affected by Change in Trustees and Mem-
bership.*

1. The General Conference of Free Baptists of the United States has
   been duly and legally organized and incorporated under the laws of
   the state of Maine, and is the legal successor of the General Con-
   ference of the Free Will Baptist Connections of the United States.
2. There has been no substantial or material departure by said Gen-
   eral Conference of Free Baptists of the United States from the
   faith and tenets of said General Conference of Free Will Baptist
   Connections of the United States, and there has never existed a
   schism in said General Conference of Free Will Baptist Connections
   of the United States nor in its said successor, the General Confer-
   ence of Free Baptists of the United States.
3. The said incorporation of the General Conference of Free Baptists
   of the United States and the change of name from that of the Gen-
   eral Conference of Free Will Baptist Connections of the United
   States to said corporate name were duly and legally authorized by
   said General Conference of Free Will Baptist Connections of the
   United States, and what is known as the new constitution and by-
   laws of said Free Baptist Church were duly and legally adopted by
   said General Conference of Free Baptists of the United States.
4. Where one of two existing factions in a church society, or the trus-
   tees or representatives of said such faction obtains a judgment of
   a court having jurisdiction of the parties and subject-matter against
   the other faction, determining the rights and interests of said par-
   ties in and to the church property of such society, such judgment
   if unreversed is *res adjudicata* as to all matters so determined in

all subsequent suits between said two factions so long as they continue substantially the same, and this is so notwithstanding the trustees, representatives and individual membership of said factions may change.

*Evans & Crawford* and *N. J. Dever*, for plaintiff.

*Frank B. Finney* and *J. C. Milner*, contra.

WALTERS, J.; JONES, J., and CHERRINGTON, J., concur.

Charles O. Graham et al v. F. F. Ransahous et al is in this court on appeal from the court of common pleas. The plaintiffs in the court of common pleas filed their petition, alleging in substance that in the year 1880 there was a church society existing in the town of Sciotoville, this county; that it has continued in existence up to the present time; that it was known as the Free Will Baptist Church Society; that in 1880 Henry Towne and wife, and Samuel McConnell and wife, by deed executed to certain trustees of said church, conveyed a lot in the village of Sciotoville to them in trust for the uses and purposes of a church. They further allege that the defendants are unlawfully keeping them out of possession, and that they are claiming to be the legal trustees of the church, whereas they are not; and alleging that the plaintiffs are the successors of the trustees who were mentioned and named from the organization of the church down to the present time; they further allege that in 1905 the defendants attempting to act as such trustees made a conveyance of the church property to the general conference of the Free Baptist Church; that the Free Baptist General Conference deeded the property back to the trustees at Sciotoville, upon certain conditions—that they should pay the taxes and keep the property insured for half its value, thus giving the property back to the trustees for religious purposes.

The prayer of the petition is that the plaintiffs may be restored to the possession of the property and their rights as the lawful trustees of the property and church, and that their title may be quieted to the same, and that the two conveyances to the trustees of the General Conference of the Free Baptist and from the General Conference of the Free Baptist back to the

trustees be set aside as fraudulent and void, and contrary to the original trust.

The answer is a substantial denial, first of the allegations in the petition; and second, it sets up that the matters and things complained of in the petition have been adjudicated in a former suit filed in the court of common pleas in this county, in 1889, substantially between these same parties, and that the judgment of the court thereon still remains unmodified and unreversed and in force.

A long reply is filed to that answer in which the plaintiffs declare that the General Conference of the Free Baptists attempted to form an organization and take over the property of this church; but that they didn't adhere to the original doctrines and tenets of the church, and that they have gone away from the original church, leaving the plaintiffs the original church people and entitled, therefore, to this property.

There has been a large amount of documentary evidence introduced in this case, and it presents two or three questions, and in order to a presentation of the same it will be necessary to dwell somewhat upon the history of this organization.

It seems from the papers and exhibits in this case that the church was organized in 1780, as a Free Will Baptist—a denomination, and that it was a voluntary association; that it continued in existence until 1827, when a General Conference was organized. In 1841 it adopted a constitution and by-laws. Article X of the constitution provides:

"This constitution may be amended at any regular session of this conference by a vote of two-thirds of the members present, provided such amendment has been proposed at a previous session, and approved by at least three-fourths of the yearly meetings belonging to the conference."

It seems this church had, in the first place, what they denominated local churches, who by prescribing to certain forms came into the association. That they had certain rules which they followed in the local church organizations; that they then had a quarterly meeting, which quarterly meeting was composed of two or more of the local churches; they then had what they

styled yearly meetings, which was composed of two or more of
the quarterly meetings.

I would say the history of the church shows in their general
conference, previous to 1889, there arose a discussion in the
general conference as to the change in the name of the church.
And in the conference that was held in 1886, appears this on
page 190 of the Free Baptist Faith:

"The conference instructs the conference board to take im-
mediate steps to secure the incorporation of the general con-
ference." Twenty-Sixth Conference, p. 508, 1886.

The name and title of the general corporate body shall be,
"The General Conference of Free Baptists." Twenty-Seventh
Conference, pp. 36, 38, 1889.

It will appear, therefore, that the General Conference of the
Free Will Baptists had under discussion in 1886 and 1889 the
incorporation of the general conference, and directed the name
by which it should be incorporated. Following that general
conference, in 1889, it appears from the proceedings that in 1891
certain persons belonging to the Free Will Baptist church pro-
cured a charter from the Legislature of the state of Maine; that
charter is a very comprehensive one, and is embraced in a special
act passed by the Legislature which gives to these incorporators
certain special privileges and provides in the act what they shall
do, and what their jurisdiction and authority shall be. And it
gives to the incorporation the name of the General Conference
of Free Baptists. In the act there is an authority to certain
designated persons therein to give a certain notice to the mem-
bers of the church—a public notice—before the call of a meeting
for the purpose of taking such steps on the act as they may see
fit. That notice appears in the records. Pursuant to that notice
on the 3d of October, 1892, the incorporators—the incorporation
you might say met at Old Orchard, Maine; there they attempted
to perfect a corporation under the special act. They adopted
unanimously the charter provided in the special act, and they
also adopted a constitution and by-laws. After having done
that they then adjourned to meet at Paige Street Church, in Low-
ell, Mass., where at the same time the Triennial General Confer-

ence of the Free Will Baptists was being held.   It seems from the
record that the incorporators went into the church—the place
where the Free Will Baptist Conference was being held, and
took possession practically of the whole proceedings.   And they
organized under the incorporation articles in the church where
the Free Will Baptists were holding the conference.   They
elected a presiding officer and a clerk, and they adopted the roll
of the delegates that had been presented to the Free Will Bap-
tists Conference, as the roll under the incorporation articles,
and proceeded to business.

Among other things, the following resolutions were adopted:

"Resolved, That whenever the clerk of the General Conference
of Free Baptists shall certify to the treasurer of the conference
that yearly, meetings and association representing three-fourths
of the membership of this denomination have approved of the
organization and incorporation of the General Conference of
Free Baptists, then the treasurer of this conference be and here-
by is directed and authorized to give, transfer, deliver, set over
and assign to the treasurer of the General Conference of Free
Baptists, a corporation duly created in the state of Maine, all
property of every name, kind and nature held by said Free
Will Baptists Connection in North America, to be held by said
treasurer of the General Conference of Free Baptists under
the same conditions, powers, and privileges as held by the treas-
urer of this conference."

That was unanimously adopted.   There is also another resolu-
tion which provides that, under the same conditions—when
three-fourths of the membership of this denomination have ap-
proved of the organization and incorporation of the General
Conference of Free Baptists, then the treasurer of this confer-
ence be and hereby is directed to transfer the aged and needy
ministers' fund, now held by him to the Conference Board of the
General Conference of Free Baptists, to be held by it for the
same purpose as now held by the treasurer of this conference.

At the same general conference, the following resolution was
adopted:

"Resolved, That the General Conference of Free Baptists
hereby recommend the yearly meetings and associations consti-

tuting the General Conference of Free Will Baptists of North America to consider the organization and incorporation of the General Conference of Free Baptists as effected at Ocean Park and perfected at Lowell under instructions given by general conference at Harper's Ferry, and if approving the same to express their approval by formal action, to be reported at once thereafter to R. Deering, clerk of the General Conference of Free Baptists, at his office in Portland, Me.; and,

"Resolved, That the various benevolent societies connected with the denomination which are expected to become merged into the General Conference of Free Baptists are advised for the time being to continue their work as at present constituted; and,

"Resolved, That when the Yearly Meetings and Associations representing three-fourths of the resident membership of the denomination shall have approved of the organization of the General Conference of Free Baptists it shall be understood as the will of the denomination that the various benevolent societies aforesaid transfer their funds and merge their interests into and with the General Conference of Free Baptists."

This appears in the proceedings of the twenty-eighth General Conference of Free Baptists, and of the Free Will Baptists Conference, partaking of the nature of both organizations.

The next triennial conference was held at Winnebago, Minn., by special appointment of those authorized to fix the time and place. In the proceedings of that triennial conference, being the twenty-ninth of the Free Baptists, appears the following:

"On motion of Webb of Maine the clerk was directed to read the records relating to the adoption of the constitution, and of the transactions affecting it, made since the Lowell Conference. The records having been read accordingly, on motion they were approved."

That, we take it, relates to the former provisions of resolutions passed in 1892, providing for the consent of three-fourths of the yearly meetings be directed to the clerk, and that when he shall have received the consent of three-fourths of the members of the yearly meetings, then these articles of incorporation of this new body should go into effect.

His report is not given there. The report is referred to as

having been read accordingly, and on motion was approved. His report in detail nowhere appears in the records submitted here in evidence. On page 11 is the report of the conference board, which was read by H. M. Ford, who is the recording secretary, and in that report appears the following:

"For the first two years the work of the board was sadly hindered while it waited for the necessary three-fourths vote of the resident membership of the denomination, which turned over to them the business of the three benevolent societies, and this took place only just one year ago, so that the board has actually had but one year to formulate and carry out its plans. Only a mere beginning could be made in so brief a time."

Though we have a reference in the official procedings of the report of this executive and financial board, yet a year before that in 1894 the necessary three-fourths of the members of the yearly meetings had been obtained.

There appears in the proceedings of this conference a correspondence betwen Rev. Thomas E. Peden and the conference— being a letter—a general letter, addressed by Mr. Peden to the conference in which he protests against any action being taken by the conference under the corporation, and the answer to that letter was referred to a special committee. The special committee drafted a letter and it was laid before the conference and adopted. In that letter appears the following:

"The experience of other denominations, while making such changes, led to expectations of this kind, but to the credit of Free Will Baptists it can be truly said that their forbearance and kindness in the premises have exceeded that of any other denomination in like circumstances. Out of a resident membership of 58,847 the large number of 49,563 voted in favor of the changes proposed before said changes were made."

It is true, we do not have the official ballots or votes, or the official report of the secretary in detail showing this vote. It is nowhere in evidence; but it is referred to in the documents from which I have just read extracts, as having been done—as having taken place—and gives the vote which constitutes more than three-fourths vote of the members of the yearly meetings.

Therefore, we take it that so far as the question presented by this record, one of the chief questions that the constitution was not changed or the incorporation was not perfected by the necessary three-fourths consent of the members of the yearly meeting is not correct; that there is nothing in the records to show that the Article X of the Constitution of 1841 was complied with. It provides that the amendment shall be proposed at a previous session. The records show that in 1892 at the regular session the proposed change was already laid before the general conference. The act of incorporation under the state of Maine was laid before the corporation. The proceedings of the corporators thereunder in their organization, the adoption of the new constitution and by-laws, and a change of the name were all three years before its adoption and at the previous triennial conference laid before the general conference. The records show that on the vote it was adopted by the three-fourths of the members present and more. The records show that three-fourths of the yearly meetings belonging to the conference had voted to accept the new constitution. The new constitution was adopted under the corporate name, and the name was changed from the Free Will Baptists to the General Conference of the Free Baptists. That was a part of the change of the constitution, because the old constitution provided that the name shall be the General Conference of the Free Will Baptist Connection. Therefore, from these records we can see that the constitution of 1841, Article X, was strictly complied with, and the new constitution was adopted and a corporation formed for the purpose of taking over by a resolution all the property of the Free Will Baptist Connection, and that by such incorporation and three-fourths consent of the yearly meetings, and a two-thirds vote of the conference, together with the proposal of all that was being done made before the previous triennial general conference have been complied with, and that by the act of incorporation and these steps having been complied with, it *ipso facto*, turned over all the property and effects of the church to the new corporation.

In the Northwestern Reporter, No. 9, Vol. 76, March 23, 1906,

on page 707, the learned counsel for the complainants in this case have given us the decision which there appears. The sixth syllabus of the case is as follows:

"Property conveyed to the trustees of an incorporated congregation vests on its incorporation in the corporation."

In this case there seems to have been just about the difference that there was between the two different factions in regard to the name. The one contending for the name of Christian Church and the other for the Church of Christ. In this case the difference between Free Will Baptists and the Free Baptists. And in the opinion the court say they incorporated under the name of the Church of Christ of Sand Creek. By that act of incorporation all the property of the Sand Creek congregation became immediately vested in that corporation, and its title thereto was not divested by the act of the defendants in error in subsequently incorporating as the Christian Church of Sand Creek.

It will be observed that these proceedings show that the local church at Sciotoville, in 1905, incorporated, and that these complainants are the trustees under the corporate act, and are now seeking as such trustees to obtain the title and the quieting of the same and possession of its church property in Sciotoville. Under that decision—under the rules, and under the constitution adopted in 1841—we must therefore hold that the incorporation was regular; that the constitution was changed by the change of name regularly—that the name was regular and authorized in 1886, and also in 1889, and that they were adopted by the necessary consent of three-fourths of the members of the yearly meetings. That would seem practically to dispose of this case; but there is another question presented and argued strenuously by counsel for complainants.

Counsel for the complainants claim under the general rule of law in regard to church associations that where there is a schism in the church, or a division, the property of the church will belong to that faction or division of the church which holds to the original doctrines and tenets of the church. And coun-

sel claim that the organization to which complainants belong, the Free Will Baptists, maintained the original doctrines and tenets of the Free Will Baptist Church Connection, as an original organization. And that the General Conference of Free Baptists is an offshoot and a seceder from the original doctrine, and therefore, that all the property of the church remains with those who stick to the old methods and doctrines and faith of the church.

At the twenty-fourth general conference, page 405, of the record, held in 1880, the following appears:

"Each religious body connected with the conference is at liberty to use in its title 'free' or 'free will' as may be preferred."

At the twenty-fifth triennial conference, page 457, of the records, held in 1883, appears the following:

"The names 'Free Will Baptists' and 'Free Baptists' are to be regarded as synonymous."
"The name and title of the general corporate body shall be 'The General Conference of Free Baptists.'" Twenty-seventh triennnial conference, pp. 36 and 38, held in 1889.

Mr. Peden, while on the stand testifying in this case, testified among other things that the doctrines of the Free Will Baptists and the Free Baptists are substantially the same. And in going through the record of the publication of the Book of Faith, and the Conference of Faith, or Articles of Faith, or whatever it may be called in ecclesiastical language, there appears no difference in the Articles of Faith of the Free Will Baptist Church as it has always stood and the Free Baptists, with the exception of one article of faith, and that appears in a little pamphlet, styled Free Will Baptist Faith, being a treatise, it is said, containing the leading points of the doctrine and principles of the Free Will Baptists, and on page 32 appears the following:

"Washing the Saint's feet. This teaches humility, purity of body as well as soul, willingness to serve every Christian in any way we possibly can to promote his spiritual welfare and

advance the Cause of Christ.  It is the duty and happy pre-
rogative of every believer to observe this sacred ordinance.''

In this record objections to this section or article of faith ap-
pear.  It was published in 1905, and for aught that appears
in this record this article of faith was adopted long after
the schism took place in 1892, and ten years after the final
adoption of the new constitution under the corporate name in
1895.  And so far as we know from this record this washing
the saint's feet faith article was passed by the Free Will Bap-
tists themselves long after all these injuries are alleged to have
occurred.  If that be so, then the Free Will Baptists have
changed faith and doctrine, if it be a change.  If it be, as
counsel claim, a radical change and in the nature of a sacred
sacrament, then the Free Will Baptists, as I say, ten years after
this change occurred, made the change from the original doc-
trine themselves, and that they are the ones that have per-
verted and receded from the original doctrine instead of the cor-
porate Free Baptists.  And they certainly can not allege as a
predicate that the original doctrine had been changed and that
they represent the original doctrine, when from all that we
know, this change occurred a long, long time after all these
things took place.  There is nothing in this whole record from
the beginning to end in the view that we take of it, that will
prevent the complainants in this case attending the church
in Sciotoville, as now organized under the Free Baptists, and
worship God according to the doctrine of the Free Will or the
Free Baptists.  And that is the foundation of all rights in a
civil court that the complainants can have, and with their doc-
trines and faiths and their eclesiastical rules of law we have
nothing to do, excepting that if their rules and courts as they
have them provide for the doing of a certain thing that is law-
ful and it is done, it precludes the civil courts from afterwards
taking jurisdiction and passing upon the question.  It seems
that this church has had different ascending functionaries and
judicatories to determine the different matters; the local church,
the local matters; the quarterly church, the quarterly matters;
the yearly meetings, the yearly matters; and the general con-

ference general supervision of all matters—constituting general courts of judicatory so far as ecclesiastical questions are concerned and for determination. And if they have determined them, this civil court has nothing whatever to do with it.

In a well considered case that was affirmed by the Supreme Court, appearing in Vol. 6, Ohio Circuit Court, p. 128, the court says:

"That where the right of property in the civil court is dependent on the question of doctrine, discipline, ecclesiastical law, rule, custom or church government, and that has been decided by the highest tribunal within the organization to which it has been carried, the civil court will accept that decision as conclusive, and be governed by it in its application to the case before it."

Having found that the ecclesiastical courts, the General Conference of the Free Will Baptists, if you please, having provided in their articles—in their constitution, Article X—how it shall be amended, or how abrogated, finding as we do that the steps provided there have been carried out, this court has nothing further to do.

There has been cited to us here a very learned case from the House of Lords, England. The holding appears in the law reports in this pamphlet containing some eight hundred pages, where a church question arose, and was decided after long and learned discussion. And the book really is a symposium of learning and eloquence in polemics and scholasticism, but so far as the merits of this case are concerned, as we view it, it is not decisive and really does not apply. The first syllabus is:

"The identity of a religious community described as a church consists in the identity of its doctrines, creeds, confessions, formularies and tests."

As we have seen and found from this record the Free Baptist Church and the Free Will Baptist Church in all their doctrines and confessions of faith are alike, except as to washing feet; and that, from this record, appears to have been introduced by the complainants themselves.

Now, there is another question (this opinion is already getting

long'), as to matters and things herein having been adjudicated. It seems in 1899 a suit was brought in this court and that the suit was between indentically the same parties that bring this suit, or their predecessors or successors.  It was the same principle exactly—to obtain possession of this church; the one faction claiming they had been put out by the other, and the other claiming that they had not. .. Why wasn't it an adjudication?  Because they are different parties here succeeding to the title of trustees in trust doen't alter the case; it must be considered as the same parties; the subject-matter is the same; the factions representing the Free Will Baptists and the Free Baptists are the same; their successors are the same; and the trust is the same and the same question was made in the subject-matter and practically between the same parties.

So far as the case being an appealable one, we adhere to our former decision, and the motion to dismiss the appeal will be overruled.  The petition of the complainants will be dismissed.

Finding and decree will be entered in favor of the defendants.